IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CHRISTOPHER A. TRENHOLME,    )
    Plaintiff,    )
        )
v.    )    No. 3:10-1126
        )
CAROLYN W. COLVIN,    )
    Acting Commissioner of Social Security,[1]    )
    Defendant.    )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On March 27, 2007, the plaintiff applied for SSI due to mental illness with an alleged disability onset date of January 1, 2003. (Tr. 10, 41, 96, 101.) His application was denied initially and upon reconsideration. (Tr. 41-47, 52-53.) The plaintiff amended his alleged onset date to March 27, 2007 (170-71), and a hearing was held before Administrative Law Judge ("ALJ") Donald Garrison on May 12, 2009. (Tr. 20-40.) On July 28, 2009, the ALJ issued an unfavorable decision (tr. 10-19), and on September 23, 2010, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on November 22, 1965 (tr. 96), and he was 41 years old as of his amended alleged onset date. He is not married, has a high school education, lives with his mother, and has previously worked as a machine feeder and car salesman. (Tr. 23-24.)

## A. Chronological Background: Procedural Development and Medical Records

### 1. Physical Impairments

From February 2002 to August 2007, the plaintiff sought treatment from the Hendersonville Medical Center emergency room for various complaints including headaches, musculoskeletal pain, and complications related to diabetes. (Tr. 506-608.) He frequently presented with headaches and pain in his neck, shoulders, elbows, hips, and back, and he was treated with a variety of pain medications. (Tr. 518-19, 542-43, 545, 547, 552, 559, 567, 571-77, 580, 583, 586, 593-94, 596, 598, 602, 606-07.) X-rays taken of his right elbow (tr. 520, 523), right hip (tr. 600), and thoracic spine

(tr. 582) were normal. X-rays of his left shoulder taken in 2002 and 2004 were normal (tr. 584, 597), but one taken in March 2005 revealed a "[s]mall inferior acromial spur" with "[n]o evidence of acute fracture." (Tr. 553.) An x-ray of his lower lumbar spine taken on March 14, 2002, revealed spondylosis without vertebral fracture and degenerative disc disease at L5-S1. (Tr. 600.) A May 11, 2004 lumbar spine x-ray showed "[m]oderate lumbosacral narrowing" (tr. 581), and a May 19, 2004 MRI showed a "[m]ild decrease in height of the disk space at L5 and S1" and "[m]inimal anterior bulge at L3 L4." (Tr. 578.) An MRI of the lumbar spine on September 8, 2004, showed "[e]ssentially no change from [the] prior study." (Tr. 392.)

The plaintiff was also treated at the emergency room for diabetic symptoms. (Tr. 506-07, 527-28, 536, 543, 545, 550, 555, 588.) Emergency room physicians described his diabetes as "uncontrolled" or "under poor control," and he frequently reported being noncompliant with diabetes medication, which he attributed to a lack of insurance and money to pay for the medication. (Tr. 527, 536, 543, 545, 550, 554.) In September 2005, he presented with elevated blood sugar levels and reported that he "ha[d] been dropped from Tenn Care and ha[d] not been able to get his medications." (Tr. 550.) On another occasion, he declined a prescription for insulin because he did not have money to pay for it, although the emergency room physician characterized it as a "cheap" and "affordable" alternative to the other diabetes medication he had been taking. (Tr. 545.) The doctor noted that, although the plaintiff claimed he could not afford medication, he smoked a pack of cigarettes a day and used a cell phone. *Id.* In February 2007, the plaintiff reported to the emergency room physician that he had not taken medication in two years and that he had self-tested his blood sugar level at "over 500." (Tr. 527, 536.) At a visit on August 4, 2007, he indicated that

3

he "ha[d] been taking his diabetes medicine as directed," and his glucose levels "ha[d] been running between 125 to the low 200s." (Tr. 506-07.)

From August 2004 to July 2005, the plaintiff frequently presented to Dr. Ifeanyi Obianyo with various complaints including pain in both shoulders, a swollen left knee, a lack of energy, and speech problems. (Tr. 274-405.) During this time, Dr. Obianyo diagnosed the plaintiff with cephalgia, hyperlipidemia, type II diabetes mellitus, hypertension, "excessive" weight gain, gastroesophageal reflux disease ("GERD"), insomnia, bipolar disorder, anxiety disorder, cervical and lumbar radiculopathy, and pain in his lower back, neck, left shoulder, and left knee. *Id.* An August 23, 2004 MRI of the plaintiff's cervical spine showed a "[s]mall disk bulge [at] C5-6 and C6-7" as well as "[m]ild central canal stenosis [at] C4-C5." (Tr. 395.) On September 8, 2004, an MRI of the plaintiff's left knee found "an area of focal partial thickness cartilage loss over the inferior margin of the lateral patellar facet associated with mild subchondral marrow edema." (Tr. 388.) This cartilage loss was characterized as a "small fissure," and the knee cartilage was "otherwise within normal limits." *Id.* An MRI of the plaintiff's left shoulder performed the same day revealed "mild acromioclavicular degeneration with a type II acromion" and "[m]ild tendinopathy of the distal supraspinatus and subscapularis fibers," but the rotator cuff was not torn. (Tr. 390.) On November 29, 2004, Dr. Obianyo wrote in a letter that the plaintiff suffered from "multiple medical and psychiatric problems that continue to render him disabled." (Tr. 338.)

The plaintiff saw Dr. Robert Fogolin at Middle Tennessee Orthopaedics between October 2004 and June 2005. (Tr. 261-73.) On October 12, 2004, the plaintiff presented with bilateral shoulder pain, worse in his left shoulder, and left knee pain. (Tr. 273.) Dr. Fogolin noted that the plaintiff's shoulder pain "increased with overhead activity or reaching behind his back." *Id.* A left

4

knee x-ray revealed "[m]ild degenerative changes," and a shoulder x-ray showed "[m]ild AC joint arthrosis" in the right shoulder and a "[t]ype II, possible type III acromion that may be consistent with impingement syndrome." (Tr. 270.) Dr. Fogolin diagnosed the plaintiff with "[b]ilateral shoulder impingement syndrome, left greater than right," "[l]eft knee patellofemoral arthralgia/arthrosis," obesity, non-insulin dependent diabetes mellitus, GERD, depression, anxiety, sleep apnea, and hyperlipidemia. (Tr. 271.) He administered a corticosteroid injection in the plaintiff's left shoulder, prescribed pain and anti-inflammatory medication, and recommended that the plaintiff try physical therapy, ointments, a knee brace, and over-the-counter pain medication. *Id.*

On November 16, 2004, Dr. Fogolin noted that these measures had not helped and recommended arthroscopic surgery on the left shoulder. (Tr. 269.) On December 17, 2004, the plaintiff underwent the procedure, which involved an arthroscopic extensive glenohumeral joint debridement, acromioplasty, and distal clavicle resection. (Tr. 268, 557-58.) On December 30, 2004, Dr. Steve Larson conducted a post-operation examination. (Tr. 268.) The plaintiff reported that he had fallen a week earlier and "noticed more popping and cracking in his left shoulder when he move[d] his arm overhead." *Id.* He also reported that he had not been to physical therapy and requested additional pain medication. *Id.* Dr. Larson detected no signs of injury from the fall, found that the plaintiff was "doing well" after surgery, referred him to physical therapy, and prescribed Lortab. *Id.*

5

On January 18, 2005, the plaintiff returned to Dr. Fogolin for a follow-up visit and again reported that he had fallen on his shoulder, mildly exacerbating his pain.[2] (Tr. 267.) Dr. Fogolin prescribed medication for pain and inflammation and advised the plaintiff to continue physical therapy. *Id.* On March 18, 2005, the plaintiff reported that he had fallen again and re-injured his shoulder. *Id.* Dr. Fogolin expressed concern that "[f]or some reason [the plaintiff] continues to injure his left shoulder," and he noted that the plaintiff had passive full range of motion but did "not put hardly any effort into his [active] range of motion." (Tr. 266-67.) Dr. Fogolin observed the plaintiff taking his coat off and noted that he "definitely moved the left shoulder much better when he thought he was not being watched." (Tr. 266.) Dr. Fogolin characterized this behavior as "strange and possible [*sic*] consistent with symptom magnification or malingering." *Id.* Dr. Fogolin concluded that, "I am definitely not going to write him any more pain medicines. He asked once again and I believe that he is having problems with it. I believe that he is addicted to them. It seems very convenient that he has injuries each time that he comes to see me. . . ." (Tr. 265.) Dr. Fogolin opined that the plaintiff "simply need[ed] to work on getting his range of motion" in his shoulder. *Id.* Dr. Fogolin administered a corticosteroid injection in the plaintiff's knee, suggested that he use a brace, and advised him that losing weight would "help him dramatically." *Id.*

A left shoulder MRI taken on March 29, 2005, found tendinopathy in the plaintiff's biceps, supraspinatus, and infraspinatus muscles as well as "[c]ystic change within the humeral head which can be associated with an impingement syndrome." (Tr. 384.) When the plaintiff presented on June 7, 2005, Dr. Fogolin expressed concern that he "seemed to be addicted to narcotic pain

_____

[2] It is unclear whether the plaintiff was reporting his original fall to Dr. Fogolin or whether a second fall had occurred.

6

medicines" and reported that Dr. Obianyo agreed with him. (Tr. 264.) Dr. Fogolin observed that the plaintiff did "not put much effort into his [shoulder] exam" and that he "showed me active range of motion where he could not go past 130 to 140 degrees, but when I pushed him passively, he easily went to 180 degrees on forward flexion/abduction." (Tr. 263.) Dr. Fogolin opined that the plaintiff was "drug seeking" and refused to provide him with pain medication. (Tr. 262-63.) He also observed that the plaintiff had "plenty of therapy" and "simply [did] not do his exercises." (Tr. 262.)

Between October 2004 and March 2005, the plaintiff had several physical therapy appointments at the Hendersonville Medical Center for neck pain, bilateral shoulder pain, and left knee pain. (Tr. 181-260.) He was discharged from physical therapy on March 14, 2005, having improved the range of motion and strength in his left shoulder, but having made "little progress" toward resolving the "significant pain" in his neck. (Tr. 223.)

On November 16, 2005, Dr. Albert Gomez, a Tennessee Disability Determination Services ("DDS") consultative physician, physically examined the plaintiff. (Tr. 410-13.) Dr. Gomez noted that the plaintiff was 5'8" tall, weighed 220 pounds, had a normal gait, and was able to get on and off the exam table without difficulty. (Tr. 411.) The plaintiff demonstrated full range of motion in his right shoulder, elbows, wrists, hips, and ankles. (Tr. 412.) He had abduction at 110 degrees with moderate tenderness to palpation in his left shoulder and flexion at 120 degrees in both knees with moderate tenderness to palpation in his left knee. *Id.* His handgrip strength was 4/5 on the left and 5/5 on the right, his upper extremity motor strength was 4/5 on the left with complaints of shoulder pain and 5/5 on the right, and his lower extremity motor strength was 5/5 bilaterally. *Id.* He had "moderate tenderness to palpation of the lumbar spine with a full range of motion." *Id.* He also had

7

"decreased sensation in both hands and feet" and had difficulty squatting, although he could perform the tandem, heel, and toe walks and stand on one leg normally. (Tr. 413.)

Dr. Gomez diagnosed chronic neck pain, chronic lower back pain, chronic shoulder pain, chronic headaches, type II diabetes mellitus, and bipolar disorder. *Id.* He opined that the plaintiff could occasionally lift 20-30 pounds and stand or sit at least six hours in an eight-hour workday with normal breaks but that he would have some difficulty reaching and lifting overhead. *Id.*

On December 19, 2005, Dr. Larry McNeil, a nonexamining DDS consultative physician, completed a physical residual functional capacity ("RFC") assessment. (Tr. 432-39.) Dr. McNeil opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 433.) Dr. McNeil found that the plaintiff was limited in his ability to push and/or pull with his left upper extremity and was limited in his ability to reach overhead on his left side. (Tr. 433, 435.) On February 21, 2006, Dr. Allen Dawson, a nonexamining DDS consultant, completed a physical RFC assessment in which he found limitations identical to those identified by Dr. McNeil. (Tr. 454-61.)

In March 2007, the plaintiff presented to Dr. Conn McConnell at the Sumner County Health Department with "out of control" blood sugar. (Tr. 481.) Dr. McConnell diagnosed the plaintiff with diabetes and prescribed Novolin, metformin, glyburide, and lisonopril.[3] *Id.* In April, the plaintiff returned with a migraine headache, lower right-arm numbness, and pain in his right elbow. (Tr. 480.) Dr. McConnell diagnosed insulin dependent diabetes mellitus ("IDDM"), adjusted the

---

[3] Novolin, metformin, and glyburide are antidiabetic medications. Saunders Pharmaceutical Word Book 323-24, 441, 501 (2009) ("Saunders"). Lisinopril is an antihypertensive. *Id.* at 410.

Case 3:10-cv-01126   Document 17   Filed 01/15/14   Page 8 of 48 PageID #: 869

plaintiff's prescription dosages, and also prescribed amoxicillin.[4]  *Id.*  The plaintiff returned to

Dr. McConnell for a follow-up examination and prescription refills on May 8, 2007.  *Id.*

The plaintiff continued to present to Dr. McConnell from August 13, 2007, to February 13,

2009, with complaints of vomiting, labored breathing, blurred vision, tremors, nausea, back pain,

and ear pain.  (Tr. 631-41.)  Dr. McConnell variously diagnosed the plaintiff with diverticulitis,

IDDM, gastroenteritis, sciatica, neuropathy, depression, and bipolar disorder.  (Tr. 631-37.)

Dr. McConnell occasionally noted the plaintiff's noncompliance with psychiatric and diabetic

medication.  (Tr. 631, 633-34, 636.)  In 2008, the plaintiff told Dr. McConnell that he had a job

working with homeless people at a church and that this was "helping his mental moods."  (Tr. 631-

32.)


2. Mental Impairments

On November 8, 2005, Marie LaVasque, M.S., M.A., a DDS consultative psychological

examiner, observed the plaintiff and completed a mental status report.  (Tr. 406-09.)  The plaintiff

reported past mental and physical abuse by a family member and a history of substance abuse,

including continued occasional marijuana use.  (Tr. 406.)  He reported a "significant alcohol abuse

history" but indicated that he had not drunk alcohol since he was eighteen years old.  *Id.*

The plaintiff denied a history of psychiatric hospitalizations but reported that a psychologist

had recommended that he be hospitalized ten years earlier.  *Id.*  He indicated that he stopped

receiving mental health treatment when he lost his insurance and that he was not taking his

medications because he could not afford them.  (Tr. 406-07.)  He reported that he had attempted

---

[4] Amoxicillin is an aminopenicillin antibiotic.  Saunders at 44.

9

suicide in the past but did not have current suicidal plans. (Tr. 407.) He said that he watched television "all day" and completed newspaper puzzles "every day." *Id.* He related that he took out the garbage, washed laundry, and shopped for groceries, and he characterized himself as an "excellent cook," but he said that his mother cleaned the house and usually prepared their meals. *Id.*

Ms. LaVasque described the plaintiff's mood as "euphoric" and his affect as "elevated." *Id.* She noted that he denied having hallucinations but reported having "flashbacks" and seeing "inanimate objects move." *Id.* Ms. LaVasque found "evidence for delusions of grandeur," but she assessed his motor status as "normal" and his thinking as "organized." *Id.* He was able to perform serial sevens calculations "without difficulty" and was "able to rapidly perform the mental computations without any errors." (Tr. 408.)

Ms. LaVasque diagnosed the plaintiff with cannabis dependence, depressive disorder not otherwise specified ("NOS"), and alcohol abuse in "[s]ustained [f]ull [r]emission (per self report)," and she assigned him a Global Assessment of Functioning ("GAF") score of 78 out of 100.[5] (Tr. 408-09.) She found "no evidence that [he] would have difficulty understanding or remembering instructions" and "no indication that [he] would have difficulty maintaining socially appropriate standards of conduct." (Tr. 409.) She found no evidence that he "would be unable to carry out instructions" and found that his "concentration [was] intact," but she found that marijuana use may

---

[5] The GAF is used to assess the psychological, social, and occupational functioning of adults. A GAF between 71 and 80 indicates "[symptoms] are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").

10

interfere with his ability to maintain a consistent schedule if left untreated. *Id.* She also found that he "may have mild to moderate difficulty adapting to changes in routine and work requirements" but that "[h]is judgment appeared good and he would likely be aware of hazards and be able to take appropriate precautions." *Id.*

On December 15, 2005, Robert Paul,[6] a nonexamining DDS consultant, completed a Psychiatric Review Technique ("PRT") and mental RFC assessment. (Tr. 414-31.) In the PRT, Mr. Paul found that the plaintiff had depressive disorder, NOS, and substance addiction disorder, and he opined that the plaintiff had moderate difficulties maintaining concentration, persistence, or pace. (Tr. 421, 425-26, 428.) In the mental RFC assessment, Mr. Paul opined that the plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions but that he could do so for "simple and low level detailed tasks." (Tr. 414, 416.) Mr. Paul opined that the plaintiff had some moderate limitations sustaining concentration and persistence but that he could "sustain adequate concentration and persistence for the above tasks despite periods of increased signs and symptoms." *Id.* He also opined that the plaintiff could "interact and get along with general public, coworkers and supervisors." (Tr. 416.) Finally, Mr. Paul opined that the plaintiff was moderately limited in his abilities to respond appropriately to changes in the work setting and to make goals or plans independently of others but that he could "adapt and respond to infrequent change" and "set limited goals." (Tr. 415-16.)

On February 21, 2006, Lea Perritt, Ph.D., a nonexamining DDS consultant, completed a mental RFC assessment and PRT. (Tr. 440-53, 462-65.) In the PRT, Dr. Perritt opined that the plaintiff had no functional limitations except for moderate difficulties maintaining concentration,

---

[6] Mr. Paul did not indicate his degree or professional license on either the PRT or RFC.

11

persistence, or pace. (Tr. 450.) In the mental RFC assessment, Dr. Perritt opined that the plaintiff had moderate limitations in several categories related to understanding and memory, sustained concentration and persistence, and adaptation. (Tr. 462-63.)

On January 31, 2007, the plaintiff presented to Kimberly Agoston, a licensed professional counselor, at Volunteer Behavioral Health Care System ("Volunteer").[7] (Tr. 467-71.) The plaintiff reported "eating his fingers" and having "overwhelm[ing]" panic attacks "every 6-9 months and smaller ones once every 3-4 weeks." (Tr. 467.) He denied current suicidal ideation but said that he did not "care about anything in his life." *Id.* He told Ms. Agoston that he was addicted to ecstacy and had previously used "almost all types of drugs," including "THC, heroin, meth, [and] prescription pills." (Tr. 469.) He also reported that he last used cocaine two months earlier and that, in the past, he had voluntarily abstained from drugs for 1-6 months. *Id.* Ms. Agoston diagnosed him with polysubstance dependence in early remission and bipolar disorder, NOS, and she assigned him a GAF score of 50.[8] (Tr. 470.) She also completed a Tennessee Clinically Related Group ("CRG") assessment form on January 31, 2007, opining that the plaintiff had mild limitations in the activities of daily living, moderate limitations in interpersonal functioning, moderate limitations in concentration, task performance, and pace, and moderate limitations adapting to change. (Tr. 749-51.) She completed a CRG assessment with identical limitations on February 4, 2007. (Tr. 746-48.)

---

[7] Volunteer includes Johnson, Hiwassee, Plateau, Guidance, and Cumberland Mental Health Centers. The ALJ referred to this service provider as "Centerstone." (Tr. 13-14.)

[8] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

12

On March 6, 2007, the plaintiff presented to Volunteer and saw Dr. Norman Leeper, Jr., for an initial medication assessment. (Tr. 472-73.) The plaintiff's diagnoses and GAF score remained unchanged, and Dr. Leeper prescribed Depakote.[9] (Tr. 473.) At a follow-up visit on May 1, 2007, the plaintiff reported "continu[ing] to feel angry at times" and having "ongoing depressive symptoms," and he expressed his belief that the benefits of Depakote had been "unclear." (Tr. 476.) He also reported, however, that he had run out of the medicine for five days due to lack of funds and that his mother had told him "his mood was worse without the Depakote." *Id.* The plaintiff's GAF score remained at 50, and Dr. Leeper increased his prescribed dosage of Depakote. (Tr. 477.) The plaintiff continued his treatment with Volunteer by visiting Dr. Leeper for medication adjustments and by meeting with a case manager approximately once a month. (Tr. 644-47, 668-84.) On June 26, 2007, the plaintiff reported to Dr. Leeper that he had experienced a "mild benefit from Depakote" but also reported that he had been taking it only sporadically because he could not afford it. (Tr. 644-45.) Dr. Leeper discontinued Depakote and prescribed Eskalith.[10] (Tr. 645.)

On July 9, 2007, Dr. Thomas Neilson, a nonexamining DDS consultative psychologist, completed a PRT and mental RFC assessment. (Tr. 488-505.) In the PRT, Dr. Neilson opined that the plaintiff had moderate limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 498.) In the mental RFC assessment, Dr. Neilson opined that the plaintiff had several moderate limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and

---

[9] Depakote is an anticonvulsant for seizures and is also used to treat manic episodes of bipolar disorder and as a migraine headache prophylaxis. Saunders at 210.

[10] Eskalith is an antipsychotic used to treat manic episodes. Saunders at 269.

13

adaptation. (Tr. 502-03.) Dr. Neilson explained that the plaintiff was able to understand, remember, and sustain concentration and persistence for "simple and low level detailed tasks" but that he would have moderate difficulties with detailed instructions and tasks. (Tr. 502, 504.) Dr. Neilson also opined that the plaintiff was markedly limited in his ability to interact appropriately with the general public, adding that he "cannot" do so, and that he would "have difficulty responding to criticism from supervisors, but can relate to supervisors and co-workers." (Tr. 503-04.) He also opined that the plaintiff "can set limited goals and adapt to infrequent change." (Tr. 504.)

At a home visit on July 20, 2007, the plaintiff told his Volunteer case manager that he was "taking his psych meds but not his diabetes meds," and he expressed suicidal ideation. (Tr. 677.) When the plaintiff and the case manager called a crisis response team, however, he indicated that he would need to call his probation officer and "find someone to take care of his mom" before going to the hospital. *Id.* He said that he would be "able to keep himself safe" over the weekend.[11] *Id.* In September 2007, he reported that he had "smoked marijuana for the first time in a couple of years" and that he had "not been taking his medications or getting out of the house at all." (Tr. 684.)

On September 7, 2007, Ms. LaVasque completed a second mental status report. (Tr. 609-12.) The plaintiff reported that he was "self-injurious" and had last attempted suicide in August of 2007. (Tr. 611.) He said that he did "not take his medication regularly" and that he usually slept until noon, watched television, prepared daily meals, and shopped once a month. (Tr. 610.) He reported that he showered only once a week due to pain in his shoulder and that he was "angry" and had a "poor appetite" but did not have crying spells or panic attacks. *Id.* He claimed to have "auditory hallucinations in the form of a male voice that was 'guiding [him] to a certain way.'" *Id.*

---

[11] Apparently, the plaintiff was admitted to the hospital the next week. (Tr. 678.)

He told Ms. LaVasque that "he believed that his mood problems [were] associated with his history of diabetes." (Tr. 609.)

Ms. LaVasque described the plaintiff's affect as "restricted" and his mood as "irritable," and she reported that he was "mildly hostile during the interview." *Id.* She assessed his attention and concentration as "intact," his language skills as "functional," his intellectual functioning as "low average," his insight as "poor," and his memory functioning as "intact." *Id.* She also observed that his "symptom presentation appeared to be inconsistent with behavioral observations and exaggerated," and she diagnosed him with polysubstance dependence in sustained full remission[12] and assigned him a GAF score of 60.[13] (Tr. 610-11.) She found "no evidence that [he] would have difficulty understanding or remembering simple or complex instructions" and no "evidence that he would be unable to carry out simple or complex instructions" or be unable to sustain concentration to complete tasks. (Tr. 611.) Ms. LaVasque opined that the plaintiff "appeared to have an exaggerated sense of his own self-worth and abilities which could limit his ability to benefit from supervision" but that he would not have difficulty working with coworkers or adapting to changes in his environment. (Tr. 611-12.) She also opined that he "appeared to have the cognitive skills necessary to manage his own finances" but that his "history of substance abuse may place him at risk of making poor financial decisions." (Tr. 612.)

_____

[12] Ms. LaVasque also suggested "rule out" diagnoses of bipolar I disorder, NOS; schizophrenia, undifferentiated type; antisocial personality disorder; and borderline personality disorder. (Tr. 611.)

[13] A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

On September 22, 2007, Andrew Phay, Ph.D, a nonexamining DDS consultant, completed a PRT and mental RFC assessment.  (Tr. 613-30.)  In the PRT, Dr. Phay found that the plaintiff had bipolar I disorder and a personality disorder evidenced by "[p]athologically inappropriate suspiciousness or hostility," "[p]athological dependence, passivity, or aggressivity," and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior."  (Tr. 616, 620.)  Dr. Phay opined that the plaintiff had mild restrictions of activities of daily living, mild difficulties maintaining concentration, persistence, or pace, and moderate difficulties maintaining social functioning.  (Tr. 623.)  In the mental RFC assessment, Dr. Phay opined that the plaintiff was moderately limited in three areas related to social functioning: (1) interacting appropriately with the general public; (2) accepting instructions and responding appropriately to criticism from supervisors; and (3) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 628.)  Dr. Phay explained that the plaintiff "appear[ed] likely to have some but not substantial difficulty to [*sic*] appropriately interact with the general public, supervisors and peers in the work place without significantly disruptive distractions or confrontations" and that he "appear[ed] able to maintain basic standards of neatness and cleanliness."  (Tr. 629.)

The plaintiff continued treatment with Volunteer from October 2007 until March 2009, during which time he was diagnosed with bipolar I disorder, severe with psychosis, and polysubstance dependence in remission.  (Tr. 646-67, 686-733, 736.)  His assigned GAF scores remained between 45-50.  (Tr. 649, 652, 654, 657, 660, 663, 665, 667, 736.)  He was treated variously with Lithium, Wellbutrin, Trazodone, Ambien, Haldol, Vistaril, and Remeron.[14]  (Tr. 648-

---

[14] Lithium is an antipsychotic for manic episodes.  Saunders at 411.  Wellbutrin is an antidepressant also used to treat attention deficit hyperactivity disorder, neuropathic pain, and weight loss.  *Id.* at 763.  Trazodone is an "antidepressant [and] serotonin uptake inhibitor . . . used for

67, 736.)  He frequently reported noncompliance with prescribed medications.  (Tr. 646, 653, 659, 662, 664, 690, 694, 706, 709, 719.)

Volunteer staff completed three CRG assessments during this time period.  On January 15, 2008, Amanda Lay, a case manager at Volunteer, assigned the plaintiff a GAF score of 50 and opined that he had mild limitations in interpersonal functioning, moderate limitations in the activities of daily living, moderate limitations adapting to change, and moderate limitations maintaining concentration, persistence, and pace.  (Tr. 743-45.)  On October 13, 2008, Dana Lynn, a case manager at Volunteer, completed a CRG assessment in which she assigned the plaintiff a GAF score of 49 and found that he had moderate limitations in all four categories, including activities of daily living, interpersonal functioning, adaptation to change, and maintaining concentration, persistence, and pace.  (Tr. 740-42.)  On February 3, 2009, Ms. Lynn prepared an updated CRG assessment in which she assigned the plaintiff a GAF score of 49 and found moderate limitations in all four categories.  (Tr. 737-39.)

### B. Hearing Testimony

At the hearing, the plaintiff was represented by counsel, and both the plaintiff and Gail Ditmore, a vocational expert ("VE"), testified.  (Tr. 20-40.)  The plaintiff testified that he graduated high school and was able to read and write.  (Tr. 23-24.)  He testified that he had a driver's license that was "[n]ot valid" because of an unpaid traffic ticket, did not have health insurance, and had no

---

aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal." *Id.* at 716. Ambien is a "sedative and hypnotic for the short-term treatment of insomnia." *Id.* at 37. Haldol is an antipsychotic used to treat "severe pediatric behavioral disorders such as aggression, combativeness, hyperexcitability, and poor impulse control." *Id.* at 333. Vistaril is a minor tranquilizer. *Id.* at 758. Remeron is an antidepressant. *Id.* at 608.

special job training, certifications, or licenses. (Tr. 24, 27.) He testified that he lived with his mother and had not worked since March 2007, due to bipolar disorder and borderline schizophrenia. (Tr. 24.) He reported that he had attempted suicide twice in the previous year and described his depression as at an "all time high." (Tr. 24, 34.)

The plaintiff testified that he previously worked as a car salesman for several different companies in 2000 and 2001. (Tr. 26-27.) He explained that, since then, he had "changed" and become more socially isolated. (Tr. 27.) He elaborated that he did not "hang out with people," had only one friend, and took care of his mother. *Id.* He testified that he did not drink alcohol, had not used illegal drugs since 2003, and kept busy by watching television. (Tr. 25, 35.)

He testified that he had been going to Volunteer since 2007 and had seen several different case managers and been on several different medications. (Tr. 27-28.) He reported that he was currently taking Remeron and Haldol. (Tr. 28.) He testified that he had been "more depressed" since starting Remeron but had not noticed any side effects from Haldol. (Tr. 29, 34.) He explained that he "[s]ometimes" ran out of medication and "every now and then" forgot to take it. (Tr. 24-25.) He testified that, in the past, he would "choose" to stop taking medication when he was suicidal "[b]ecause [he'd] rather be dead sometimes," but that he was currently taking medication. (Tr. 25, 32-33.) He testified that when he stopped taking medication, he would be hospitalized and "force[d]" to take it. (Tr. 33.) He testified that his mother gave him his medication but that sometimes they would not have money to buy it. (Tr. 26, 33.)

The plaintiff also reported having several physical problems, including a left shoulder injury that required surgery, a similar problem developing in his right shoulder, a "slight" neck fracture in 1991 that caused migraine headaches, and degenerative disc disease and bulging discs in his back.

18

(Tr. 29-30.)  He testified that he was 5'10" tall and weighed 240 pounds and that his weight increased when he started taking insulin for diabetes.  (Tr. 30-31.)  The plaintiff testified that he had only started taking insulin two weeks before the hearing.  (Tr. 31.)  He said that, before he started taking insulin, he was prescribed metformin and glyburide but only took them once a day instead of twice a day as prescribed because he did not remember to take them.  *Id.*  He testified that diabetes caused him to "hurt a lot."  *Id.*

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and she classified the plaintiff's past job as a machine feeder as medium, unskilled work and his past job as a car salesman as light, skilled work.  (Tr. 23.)  The ALJ asked the VE to consider a hypothetical person with the plaintiff's age, education, and work experience who could perform light work with occasional postural activities but could not reach overhead; could understand, remember, and carry out short and simple instructions; could make judgments on simple work-related decisions; could not interact with the public; and must be able to sit or stand at will.  (Tr. 36.) The VE responded that such a person would not be able to perform the plaintiff's past relevant work but could work in unskilled, light and sedentary jobs such as production worker, inspector, packer, and sorter.  (Tr. 36-37.)  The VE testified that these jobs would still be available to a person who required simple, routine tasks with no changes in work procedures or requirements.  (Tr. 37.)  The VE testified that these jobs would not be available if the person was unable to perform "production rate, paced quota jobs," but she testified that a person with this additional limitation could work as a surveillance systems monitor or sedentary hand laborer.  *Id.*  Additionally, the VE testified that, although a person with a GAF score in the range of 51-60 would be able to perform these jobs, a

19

person with a GAF score of 50 or below would not.  (Tr. 37-38.)  The VE also testified that, if the

ALJ found the plaintiff's testimony to be fully credible, no jobs would be available.  (Tr. 38.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 28, 2009.  (Tr. 10-19.)  Based upon the

record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq.*).

2. The claimant has bipolar disorder; polysubstance abuse, in remission; diabetes mellitus; degenerative joint disease of the bilateral shoulders; and lumbar degenerative disc disease; which are found to be a "severe" combination of impairments, but not severe enough, either singly or in combination, to meet or medically equal the requirements set forth in the Listing of Impairments.  Appendix I to Subpart P, Regulations No. 4.

* * *

3. After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform a limited range of light work; lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; with occasional ability to perform all postural activities; and no ability to perform any overhead work.  Additionally, the claimant is able to understand, remember and carry out short, simple instructions and make judgments on simple work-related decisions; but cannot have any contact with the public.

* * *

4. The claimant is unable to perform any past relevant work (20 CFR 416.965).

* * *

5. The claimant is 43 years old, described as a younger individual (20 CFR 416.963).

6. The claimant has a high school education and is able to communicate in English (20 CFR 416.964).

20

7. Transferability of job skills is not an issue in this decision, as the claimant is found "not disabled." (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

* * *

9. The claimant has not been under a disability, as defined in the Social Security Act, since March 27, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-19.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

22

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. § 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education, or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found

23

disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff

24

can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 416.920(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 12.) At step two, the ALJ determined that the plaintiff had a severe combination of impairments including bipolar disorder, polysubstance abuse in remission, diabetes mellitus, degenerative joint disease of the bilateral shoulders, and lumbar degenerative disc disease. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff was not capable of performing his past relevant work. (Tr. 18.) At step five, the ALJ determined that the plaintiff could perform light work as a production worker, inspector, or sorter as well as sedentary work as a production worker, inspector, sorter, surveillance systems monitor, or hand laborer. (Tr. 18-19.)

25

**C. The Plaintiff's Assertions of Error**

The plaintiff makes several interrelated arguments. It appears that the plaintiff's arguments are as follows: (1) whether the ALJ properly assessed the plaintiff's mental impairments, including whether the ALJ erred by (a) giving the plaintiff's GAF scores little weight, (b) determining that the plaintiff's impairments did not meet Listing 12.04C, and (c) failing to correctly evaluate the plaintiff's mental impairments under 20 C.F.R. §§ 416.920a and 416.945(c); (2) whether the ALJ properly assessed the medical evidence from Dr. Obianyo; (3) whether the ALJ properly assessed the plaintiff's obesity; (4) whether the ALJ properly assessed the plaintiff's subjective complaints of pain; (5) whether the ALJ erred in formulating the plaintiff's RFC; and (6) whether the ALJ properly relied on the VE's testimony. Docket Entry No. 12-1, at 9-24.

**1. The ALJ properly assessed the plaintiff's mental impairments.**

The plaintiff makes several arguments related to the ALJ's assessment of his mental impairments. Specifically, he argues that: (a) the ALJ erred in discrediting GAF scores assigned to him by mental health professionals at Volunteer (Docket Entry No. 12-1, at 11-14, 18-19, 22-24); (b) the ALJ erred by not finding that the plaintiff met Listing 12.04C (*id.* at 9-12); and (c) the ALJ erred by "failing to correctly evaluate" the plaintiff's mental limitations under 20 C.F.R. §§ 416.920a and 416.945(c). *Id.* at 22-24.

26

**a. The ALJ properly assessed the plaintiff's GAF scores.**

The plaintiff argues that the ALJ erred by discrediting the GAF scores assigned to him by mental health professionals at Volunteer.[15]  Docket Entry No. 12-1, at 11-14, 18-19, 22-24.  The plaintiff argues that his GAF scores show a "serious impairment in social or occupational functioning" and that he "cannot perform a full range of work at any exertional level." *Id.* at 18, 22.

The plaintiff's treatment records from Volunteer indicate that he was regularly assigned GAF scores between 45-50.[16]  (Tr. 470, 473, 477, 645, 647, 649, 652, 654, 657, 660, 663, 665, 667, 736, 739, 742, 745.)  A GAF score between 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. 2006) (emphasis in original).  *See also* DSM-IV-TR at 34.  In *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.), this Court noted that:

> A GAF score can be helpful in assessing an individual's mental RFC.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006).  At the same time, the Sixth Circuit recognizes that a GAF score is a physician's subjective evaluation and not raw medical data.  *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007).  The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings."  65 Fed. Reg. 50,745, 50,764-765 (Aug. 21, 2000); *see also Kennedy*, 247 Fed. Appx. at 766; *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006).

---

[15] The plaintiff makes this argument in support of several assertions of error, including that he meets the requirements of Listing 12.04C (Docket Entry No. 12-1, at 11); that the ALJ erred in his RFC assessment (*id.* at 12-14); that the ALJ did not properly weigh the medical opinion evidence (*id.* at 18-19); that the ALJ did not properly evaluate the plaintiff's mental condition (*id.* at 22-23); and that the ALJ improperly relied on the VE's testimony.  *Id.* at 24.

[16] As the ALJ noted, the plaintiff was also assigned GAF scores of 78 and 60 by Marie LaVasque in 2005 and 2007, respectively. (Tr. 14-15, 409, 611.)

27

*Bratton*, 2010 WL 2901856, at *8. As the Sixth Circuit has pointed out, there is no "statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place," *Kornecky*, 167 Fed. Appx. at 511, and "[a] GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011). However, although a GAF score is not dispositive in determining an individual's mental RFC, it can be one of several factors weighed or considered in assessing an individual's mental RFC, *see Kornecky*, 167 Fed. Appx. at 503 n.7, and it can be useful in evaluating the consistency of a physician's treatment notes and opinions. *Bratton*, 2010 WL 2901856, at *8.

When assessing the plaintiff's GAF scores from Volunteer,[17] the ALJ noted that:

> [T]here was little, if any, rationally discernible pattern or connection between the limitations assessed and GAF rating. This was most notable on all CRG forms that never indicated anything more than moderate limitations in any of the four functional realms listed above. In fact, he was actually found with only mild limitations in activities of daily living and in interpersonal functioning in January 2007 and January 2008, respectively.
>
> . . . .
>
> The treating mental health providers concluded the claimant was severely impaired, overall, by GAF scores. However, these low scores were in direct conflict with the actual numerical limitations assigned to each functional realm, therefore, [they] are afforded little weight.

(Tr. 14, 17.)

The ALJ appropriately considered the plaintiff's GAF scores and adequately explained his rationale for discounting them. As the ALJ noted, although mental health professionals at Volunteer regularly assigned the plaintiff GAF scores in the range indicating serious symptoms, CRG

---

[17] As noted above, the ALJ referred to this service provider as Centerstone, although there is no indication that the plaintiff was ever treated at Centerstone.

28

assessments completed by these same professionals found the plaintiff to be, at most, moderately limited in the categories of activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 737-51.) However, despite indicating only mild to moderate limitations, the CRG assessments contain GAF scores placing the plaintiff's symptoms in the serious range. *Id.* The ALJ, tasked with resolving these discrepancies, determined that this "direct conflict" discredited the GAF scores assigned by Volunteer staff members. (Tr. 17.) The ALJ concluded that Ms. LaVasque's opinions, which twice found mild to moderate limitations, were more consistent with the record and gave her opinions significant weight. *Id.* It was the ALJ's prerogative to credit or discredit the plaintiff's GAF scores, and the ALJ adequately explained his decision to give them little weight.

### b. The plaintiff does not meet Listing 12.04C.

The plaintiff argues that he meets the criteria of Listing 12.04C for affective disorders and that he is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 12-1, at 9-12. The ALJ did not specifically analyze the plaintiff's impairments under Listing 12.04C but generally found that none of the plaintiff's impairments met or equaled a listed impairment. (Tr. 12.)

The plaintiff has the burden of proof at step three to demonstrate that "he has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how

29

severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990). If the plaintiff

demonstrates that his impairment meets or equals a listed impairment, the ALJ must find the plaintiff

disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*,

835 F.2d 139, 140 (6th Cir. 1987)).

The plaintiff argues that his mental impairments meet the requirements of the second and

third paragraphs of Listing 12.04C.[18] Docket Entry No. 12-1, at 9-12. In order to satisfy the

requirements of Listing 12.04C, the plaintiff must demonstrate:

> C. Medically documented history of a chronic affective disorder of at least 2 years'
> duration that has caused more than a minimal limitation of ability to do basic work
> activities, with symptoms or signs currently attenuated by medication or
> psychosocial support, and one of the following:
>
> . . . .
>
> 2. A residual disease process that has resulted in such marginal adjustment that even
> a minimal increase in mental demands or change in the environment would be
> predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly
> supportive living arrangement, with an indication of continued need for such an
> arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C.

Assuming *arguendo* that the plaintiff satisfies the criteria found in the introductory paragraph

of Listing 12.04C, he does not satisfy the criteria in either paragraphs two or three. First, the

plaintiff has not shown that he has "[a] residual disease process that has resulted in such marginal

adjustment that even a minimal increase in mental demands or change in the environment would be

predicted to cause [him] to decompensate." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C(2). The

---

[18] The plaintiff does not argue that he meets sections A or B of Listing 12.04. The plaintiff
also does not argue that he equals a listed impairment.

plaintiff argues that he meets the listing due to his GAF scores and history of mental illness, including suicidal thoughts, panic attacks, anger outbursts, and hallucinations. Docket Entry No. 12-1, at 10-11. As discussed elsewhere in this Report and Recommendation, the ALJ chose to assign little weight to the plaintiff's GAF scores and found the plaintiff's testimony to be not entirely credible. (Tr. 17.) Moreover, although the plaintiff has a long history of mental illness, there is insufficient evidence to suggest that a minimal increase in mental demands or changes in his environment would lead to decompensation.

On several CRG assessments, Volunteer staff opined that the plaintiff's impairments were no more than moderate, and, in some instances, mild. (Tr. 737, 740, 743, 746.) Several DDS psychological consultants prepared mental RFC assessments indicating that the plaintiff had moderate limitations.[19] (Tr. 414-15, 462-63, 502-03, 627-28.) Only once, on Dr. Neilson's July 9, 2007 mental RFC assessment, was the plaintiff assessed as having a marked limitation, and that was a limitation on his ability to interact appropriately with the general public.[20] (Tr. 503.) The ALJ chose to place significant weight on Ms. LaVasque's opinions that the plaintiff had only mild to moderate limitations overall. (Tr. 17, 409, 611-12.) Indeed, in November 2005, Ms. LaVasque opined that the plaintiff would have only "mild to moderate difficulty adapting to changes in routine

_____

[19] The plaintiff contends that some of these psychological consultants' opinions were based on an incomplete medical record because they predated his treatment at Volunteer where he received GAF scores indicative of serious symptoms. Docket Entry No. 12-1, at 11, 23. As the Sixth Circuit has noted, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" and "need only be 'supported by evidence in the case record.'" *Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. Jan. 4, 2011) (quoting Soc. Sec. Rul. 96-6p). The ALJ was entitled to rely on this evidence even though it predated other evidence in the record.

[20] The ALJ appropriately included a limitation against contact with the public in the plaintiff's RFC. (Tr. 12.)

31

and work requirements" (tr. 409), and in September 2007, she opined that he "would not have difficulty adapting to changes in his environment." (Tr. 612.) Finally, on four different occasions, DDS psychological consultants evaluated whether the plaintiff met the criteria of Listing 12.04C and determined that he did not. (Tr. 429, 451, 499, 624.) This medical opinion evidence falls short of establishing the necessary criteria to meet paragraph two of Listing 12.04C.

The plaintiff also does not meet the criteria of paragraph three of Listing 12.04C, which requires a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C(3). The Regulations explain that:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F.

The plaintiff argues that the evidence shows that he is single, 46 years old, lives with his mother, tends to isolate himself at home, and relies on others for transportation and housing. Docket Entry No. 12-1, at 10-11. He testified that his mother gave him his medication, and, during his treatment with Volunteer, a case manager made monthly home visits. (Tr. 26, 677-733.) These are not the sort of "highly structured settings" contemplated by Listing 12.04C. Other than the plaintiff's testimony that his mother gave him medication, testimony that the ALJ found to be not entirely credible, there is no indication that the plaintiff's medication compliance or general mental

32

health treatment is managed by others. The plaintiff reported on several occasions that he stopped taking medications while living at home for reasons unrelated to his mother's management. (Tr. 24-26, 33, 406-07, 470, 476, 610, 644, 646, 653, 659, 662, 664, 690, 694, 706, 709, 719.) In fact, the plaintiff testified and reported on other occasions that his mother's health was in decline and that he was the one taking care of her. (Tr. 27, 467, 646, 677.) Similarly, the fact that a case manager from Volunteer visited the plaintiff at his home on a monthly basis is insufficient to show that he lived in a "highly supportive living arrangement" or that he would be unable to function outside of such an arrangement.

In sum, the plaintiff has not shown that he meets Listing 12.04C, and the ALJ's decision that the plaintiff does not meet the criteria of any listed impairment is supported by substantial evidence in the record.

### c. The ALJ did not err by failing to evaluate the plaintiff's mental impairments in accordance with 20 C.F.R. §§ 416.920a and 416.945(c).

The plaintiff argues that the ALJ erred by "failing to correctly evaluate [his] mental conditions in accordance with 20 C.F.R. §§ 416.920a and 416.945(c)." Docket Entry No. 12-1, at 22.

The Regulations provide that when the Social Security Administration ("SSA") evaluates a plaintiff's mental abilities, it will:

> first assess the nature and extent of [the plaintiff's] mental limitations and restrictions and then determine [the plaintiff's] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [the plaintiff's] ability to do past work and other work.

33

20 C.F.R. § 416.945(c). When assessing the severity of the plaintiff's mental impairment, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. § 416.920a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 416.920a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[21] 20 C.F.R. § 416.920a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. § 416.920a(b)(2). The Regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. § 416.920a(c)(4). For the first three categories, the Regulations set forth a five-

---

[21] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 416.920a(e).

point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, and four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009). If the impairment is severe, then the ALJ "will then determine if it meets or is equivalent in severity to a listed mental impairment," and, if it does not, then the ALJ will move on to assess the plaintiff's RFC. 20 C.F.R. § 416.920a(d)(2)-(3).

The ALJ is also required to follow 20 C.F.R. § 416.920a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 416.920a(c)(3).[22] 20 C.F.R. § 416.920a(e)(4).

Although the ALJ did not specifically cite to 20 C.F.R. § 416.920a, the ALJ's decision shows that he correctly applied the special technique in this case. First, the ALJ found that the plaintiff had the medically determinable impairments of bipolar disorder and polysubstance abuse in remission and that these impairments were severe but did not meet or equal a listed impairment. (Tr. 12.) The ALJ then evaluated the Part B criteria by assessing the plaintiff with mild restrictions of activities

---

[22] Since 2000, the ALJ is no longer required to complete a Psychiatric Review Technique Form ("PRTF"). *Rabbers,* 582 F.3d at 653-54. The Regulations only require that an ALJ's written decision "incorporate the pertinent findings and conclusions based on the [special] technique." *Id.*

of daily living, moderate difficulties in social interaction, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* The ALJ then went on to assess the plaintiff's RFC, finding that he was "able to understand, remember and carry out short, simple instructions and make judgments on simple work-related decisions; but cannot have any contact with the public." (Tr. 12-18.)

Throughout his decision, the ALJ discussed many facets of the plaintiff's mental health, including, *inter alia*, his daily activities, treatment history, frequent noncompliance with prescribed medications, and the opinions of treating and consultative sources. The ALJ complied with 20 C.F.R. § 416.920a by assessing the "B" criteria and giving specific ratings for each of the four functional limitation categories. (Tr. 12-18.) Likewise, after assessing the plaintiff's mental limitations, the ALJ properly evaluated his mental RFC as required by 20 C.F.R. § 416.945(c). The ALJ made specific findings supporting his decision and these findings are supported by substantial evidence in the record.


### 2. The ALJ properly assessed the medical evidence from Dr. Obianyo.

On November 29, 2004, Dr. Obianyo wrote in a letter that the plaintiff's "multiple medical and psychiatric problems . . . continue to render him disabled." (Tr. 338.) Although the ALJ addressed the plaintiff's treatment with Dr. Obianyo, he did not specifically address this letter. (Tr. 15-16.) The plaintiff makes separate arguments that the ALJ "failed to consider" Dr. Obianyo's statement (Docket Entry No. 12-1, at 16-17) and that the ALJ did not give this statement proper weight. *Id.* at 17-19. Both arguments are addressed here.

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). The medical opinion of a treating source[23] is entitled to "controlling weight" if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[24] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If the ALJ does not give a treating source's medical opinion controlling weight, he must weigh the opinion using the factors in 20 C.F.R. § 416.927(c)(2)-(6)[25] and provide "good reasons" for the weight given to the treating

---

[23] The Regulations define a treating source as "[the plaintiff's] own physician, psychologist, or other acceptable medical source who provides [the plaintiff], or has provided [the plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the plaintiff] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the plaintiff's] medical condition(s)." *Id.*

[24] Effective March 26, 2012, the numbering for the treating physician rule changed, and section 416.927(d)(2) became section 416.927(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

[25] Appropriate factors include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. § 416.927(c)(2)-(6).

37

source's opinion.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. § 416.927(c)(2)).  The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*  If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[26]  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

Given the regularity with which Dr. Obianyo examined the plaintiff (tr. 274-405), he is properly considered a treating source under 20 C.F.R. § 416.902.  However, Dr. Obianyo's statement that the plaintiff is disabled is not a medical opinion. The Regulations provide that opinions that a plaintiff is disabled are "not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. § 416.927(d)(1).  The ALJ was not required to accept Dr. Obianyo's conclusion on the "ultimate issue of disability."  *Maple v. Apfel*, 14 Fed. Appx. 525, 536 (6th Cir. 2001).  The Court also notes that this statement significantly precedes the plaintiff's alleged onset date of March 27, 2007.  Because Dr. Obianyo did not complete another medical opinion assessing the extent of the plaintiff's functional limitations, the ALJ did not err by failing to address Dr. Obianyo's statement that the plaintiff was disabled.

---

[26] The rationale for the "good reasons" requirement is to provide the plaintiff with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

38

**3. The ALJ did not err by failing to address the plaintiff's obesity and its effect on his ability to work.**

The plaintiff contends that the ALJ did not properly consider his obesity when determining his RFC.  Docket Entry No. 12-1, at 19-20.

Social Security Ruling ("SSR") 02-01p, which details the SSA's policy on obesity, provides that, even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's RFC.  Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1.  Accordingly, SSR 02-01p provides that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

The Sixth Circuit has held that SSR 02-01p does not offer "any particular procedural mode of analysis for obese disability claimants."  *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. Jan. 31, 2006)).  Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations."  *Id.*  (quoting *Bledsoe*, 165 Fed. Appx. at 412).  However, obesity should be evaluated on a case by case basis because it "*may or may not* increase the severity or functional limitations of the other impairment."  Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *6 (emphasis added).  An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of his obesity.  *See Coldiron*, 391 Fed. Appx. at 443.  The Sixth Circuit has also held that an "ALJ does not need to make specific mention of obesity if he credits an expert's

39

report that considers obesity." *Bledsoe*, 165 Fed. Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The plaintiff testified that he was 5'10" and weighed 240 pounds (tr. 30), and the record contains diagnoses and descriptions of his obesity. (Tr. 266, 271, 298, 302, 506, 528.) He argues that the ALJ erred by not addressing his obesity and that the ALJ should have considered whether he had any functional limitations due to his obesity. Docket Entry No. 12-1, at 19-20.

Initially, the Court notes that the ALJ gave significant weight to the opinion of Dr. Gomez, who specifically noted the plaintiff's height and weight in his examination.[27] (Tr. 17, 411.) Because he credited Dr. Gomez's opinion, it was not necessary for the ALJ to specifically mention the plaintiff's obesity in his decision. *See Bledsoe*, 165 Fed. Appx. at 12. Moreover, because the plaintiff bears the burden of proving the extent of his functional limitations, he must prove the degree of functional loss resulting from obesity. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Although the plaintiff was occasionally diagnosed as being obese, no treating or consulting physician opined that he experienced limitations due to his weight.[28] As the defendant points out, the plaintiff's argument solely relies on the assumption that, given the plaintiff's height

---

[27] Dr. Gomez found the plaintiff to be 5'8" tall and weigh 220 pounds. (Tr. 411.) The plaintiff testified that he was 5'10" tall and weighed 240 pounds. (Tr. 30.)

[28] On one occasion, when assessing the plaintiff's left knee pain, Dr. Fogolin opined that the plaintiff was at least fifty pounds overweight and that losing weight would "help him dramatically." (Tr. 265.) However, aside from a few reports of tenderness in his left knee (tr. 284, 410-12), there is very little subsequent medical history related to the plaintiff's knee pain. The plaintiff did not mention knee pain at the hearing, and the ALJ did not include knee pain as a severe impairment. It appears that the plaintiff's knee pain was resolved, and Dr. Fogolin's isolated suggestion that the plaintiff should lose weight to relieve knee pain falls short of establishing that the plaintiff has functional limitations resulting from obesity.

40

and weight, he falls within the obesity range. Docket Entry No. 13, at 18. A diagnosis of obesity, without more, does not render such obesity a severe impairment. The plaintiff was required to demonstrate the degree of functional loss resulting from his obesity. *See* Soc. Sec. Rul. 02-01p. He has not done so. The ALJ properly considered the medical evidence of record, including the plaintiff's testimony and the reports of his treating and consulting physicians, and properly determined that obesity did not result in functional limitations for the plaintiff.

### 4. The ALJ properly evaluated the plaintiff's subjective complaints of pain.

The plaintiff argues that the ALJ erred in evaluating the credibility of his subjective complaints of pain. Docket Entry No. 12-1, at 20-22. The ALJ found that:

> The claimant is not entirely credible in that he testified he had never drunk alcohol and had stopped using drugs in 2003; but told the psychological examiner [Ms. LaVasque], he drank heavily until age 18 and still . . . occasionally used marijuana in 2005. Additionally, the claimant actually told [Ms. LaVasque] that the claimant's depression was caused by diabetic symptoms. It was also most telling that the claimant was able to perform serial sevens and mental computations without difficulty. While the claimant certainly did have mental health issues, the claimant admitted medication helped his symptoms. Significantly, the claimant actually improved to the point, he was doing well enough to work at a church, feeding the homeless. Deference is given to the claimant in that highly elevated glucose levels would certainly cause problems. However, the claimant was often without medication, voluntarily; and when compliant with medication, the claimant actually admitted he improved. Although the claimant frequently stated he could not afford his medication, he was able to purchase cigarettes and pay for a cell phone.[29] The claimant's credibility also came into question regarding the severity of his pain complaints. No objective testing ever yielded anything more than minimal or mild

---

[29] It is not at all clear that the plaintiff actually paid for a cell phone. In making this assertion, the ALJ presumably relied on the notes of the November 7, 2005 emergency room physician who noted that the plaintiff "has a cell phone that he uses." (Tr. 545.) That observation alone does not support a conclusion that the plaintiff was able to "pay for" a cell phone. To suggest that the plaintiff had large sums of money that he could have used to pay for his medications is not supported by the record.

abnormalities, except for the left shoulder. However, he had achieved full range of motion and strength upon discharge from post-operative therapy. Additionally, both the treating physician and orthopedist felt the claimant was addicted to prescribed pain medication. The claimant's subjective complaints are not persuasive to the extent alleged.

(Tr. 17-18.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff's] complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F. 3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847

42

(6th Cir. 1986), set forth the basic standard for evaluating such claims.[30]  The *Duncan* test has two

prongs.  The first prong is whether there is objective medical evidence of an underlying medical

condition.  *Felisky*, 35 F.3d at 1039.  The second prong has two parts: (1) whether objective medical

evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the

objectively established medical condition is of such a severity that it can reasonably be expected to

produce the alleged disabling pain.  *Id.*  This test does not require objective evidence of the pain

itself.  *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The SSA also provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R.

§ 416.929(c).[31]  The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence,

or intensity of his pain simply because current objective medical evidence does not fully corroborate

the plaintiff's statements.  20 C.F.R. § 416.929(c)(2).

The ALJ satisfied the first prong of the *Duncan* test when he found that the plaintiff had a

medically determinable impairment that could reasonably be expected to produce some of the

alleged symptoms.  (Tr. 17.)  However, for a number of reasons, the ALJ found that the plaintiff's

complaints were "not persuasive to the extent alleged."  *Id.*   Contrary to the plaintiff's assertion that

---

[30] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987.  *See Felisky*, 35 F.3d at 1039 n.2.

[31] The seven factors under 20 C.F.R. § 416.929(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other facts concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

43

the ALJ "merely decided that [he] was not credible and disregarded all his years of documented symptoms, pain, and suffering" (Docket Entry No. 12-1, at 21), the ALJ in fact discussed the plaintiff's credibility in significant detail.

The ALJ relied upon the plaintiff's medical records and testimony in making his credibility assessment and articulated several reasons supporting his decision. The ALJ discussed a number of factors, including documented inconsistencies in the plaintiff's reports to medical professionals and his testimony, the effectiveness of the plaintiff's medication and his frequent noncompliance with prescribed medication, his daily activities, and the lack of objective findings to support the severity of his complaints of pain. The ALJ sufficiently explained his reasoning for finding that the plaintiff's subjective complaints were not credible and addressed several of the factors outlined in 20 C.F.R. § 416.929(c)(3). The Court concludes that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations were not fully credible. The ALJ's decision demonstrates that he complied with the *Duncan* test and 20 C.F.R. § 416.929 in evaluating the plaintiff's credibility.

### 5. The ALJ did not err in formulating the plaintiff's RFC.

The plaintiff argues that the ALJ erred in finding that he could perform light work. Docket Entry No. 12-1, at 12-16. The ALJ actually found that the plaintiff could perform a limited range of light work. (Tr. 12.) The plaintiff's argument relies on his previous unpersuasive arguments that the ALJ erred by not crediting his GAF scores and by not accepting at face value Dr. Obianyo's statement that he was disabled. However, because the ALJ appropriately did not credit this evidence, he was not required to include such information in his RFC assessment.

44

The plaintiff also faults the ALJ for giving little weight to the opinion of the "state agency physician." Docket Entry No. 12-1, at 15; (tr. 17). It is unclear to whom the ALJ was referring because two DDS consultative physicians, Drs. McNeil and Dawson, completed physical RFC assessments. (Tr. 432-39, 454-61.) However, the lack of clarity makes little difference because these opinions contain identical limitations.

The plaintiff argues that the ALJ improperly selected from these opinions certain limitations, such as a limitation on overhead reaching, while disregarding others, such as a limitation for frequent pushing and/or pulling. Docket Entry No. 12-1, at 15. The Court is not persuaded that the ALJ erred. First, while the ALJ must consider each medical opinion, he is not required to accept an opinion in its entirety. In this case, he chose to give these opinions little weight because he found that the plaintiff had greater limitations than those assessed by Drs. McNeil and Dawson. (Tr. 17.) Second, the ALJ did not "pick and choose" limitations as the plaintiff suggests. Rather, because the ALJ gave little weight to the nonexamining consultative physicians' opinions, he did not include a limitation related to pushing and/or pulling. The limitation on overhead reaching that the ALJ included in the plaintiff's RFC does not originate from these opinions at all, but rather from the opinion of Dr. Gomez, the consultative examiner.

The ALJ gave significant weight to Dr. Gomez's opinion when assessing the plaintiff's physical limitations. (Tr. 17.) Dr. Gomez opined that the plaintiff "would have some difficulty reaching and lifting overhead" but that he could occasionally lift 20-30 pounds, stand six hours, and sit six hours in an eight-hour workday. (Tr. 413.) The ALJ adopted these limitations, or ones more severe, when determining the plaintiff's RFC. (Tr. 12.) When assessing the plaintiff's mental limitations, the ALJ gave significant weight to Ms. LaVasque's opinions and in fact assessed more

45

restrictive limitations when he found that the plaintiff should not have any contact with the public and should be limited to tasks involving simple instructions and simple work-related decisions. (Tr. 12, 17, 409-12, 609-12.)  The ALJ's assessment of the plaintiff's RFC is in line with these opinions and is supported by substantial evidence in the record.


### 6. The ALJ did not err in relying on the testimony of the VE.

The plaintiff argues that the ALJ erred in relying on the testimony of the VE that there are jobs that the plaintiff is able to perform.  Docket Entry No. 12-1, at 24.

The Regulations allow the ALJ to rely on the testimony of a VE at step five to determine whether the plaintiff is able to perform any work.  20 C.F.R. § 416.960(c).  The VE's testimony, in response to the ALJ's hypothetical question, will be considered substantial evidence "only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental impairments."  *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky*, 35 F.3d at 1036) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs.").  Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible."  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. Feb. 9, 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The plaintiff cites to the VE's testimony that a person with GAF scores of below 50 would be unable to perform the jobs that the VE identified. Docket Entry No. 12-1, at 24; (tr. 37-38). However, as discussed above, the ALJ did not credit these GAF scores and was, therefore, not required to include such limitations in a hypothetical question to the VE or when formulating the plaintiff's RFC. The plaintiff also contends that the ALJ "failed to consider" the plaintiff's subjective complaints and the medical evidence when questioning the VE. Docket Entry No. 12-1, at 24. This argument repeats the plaintiff's prior contentions that have been addressed above. The ALJ fully addressed the plaintiff's subjective complaints and the medical record, including the medical opinion evidence, in great detail. When formulating the hypothetical question to the VE, the ALJ included only those limitations that he found credible and supported by the evidence. The ALJ did not err in questioning the VE or in relying on the VE's testimony to conclude that the plaintiff could perform some work.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 12) be DENIED and that the decision of the ALJ be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the

right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge